# In the United States Court of Federal Claims

No. 20-712C
(Filed: September 2, 2022)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| SNJEZANA COYNER, | Overtime compensation; 38 U.S.C. § 7453(e); credit hours; flexible schedule employees; 5 U.S.C. § 6121-26 |
| *Petitioner*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Jacob Y. Statman,* Baltimore, MD, for plaintiff.

*Rebecca S. Kruser*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Elizabeth M. Hosford*, Assistant Director, for defendant. *Robert C. Burlison III*, Senior Trial Attorney, United States Department of Veteran Affairs, Continental District, of counsel.

## OPINION

BRUGGINK, *Judge*.

This is an action brought by an employee of the United States Department of Veteran's Affairs ("VA"). Ms. Coyner, a registered nurse under 38 U.S.C. § 7401 (2018), filed this action alleging that she is entitled to overtime pay pursuant to 38 U.S.C. § 7453(e) and VA policies authorized under 38 U.S.C. § 7421. The government filed a motion for summary judgment, and after full briefing, oral argument was held on August 24, 2022. For the reasons that follow, defendant's motion for summary judgment is denied.

BACKGROUND

I.  Factual Background

From June 24, 2018, to August 3, 2019, Ms. Coyner worked as Associate Chief Nurse ("I") for the VA Care in the Community ("VACC") program at the VA Medical Center in Grand Junction, Colorado. The VACC program coordinates veteran care by non-VA providers when the VA cannot provide certain services; Ms. Coyner's role was to manage the VACC program during a time of nationwide transition from the Choice Program to the Mission Act. Plaintiff's Deposition ("Pl. Dep.") 18.[1] Ms. Coyner's position as I was exempted from the Fair Labor Standards Act ("FLSA"). App. To Def. Mot. ("Def. App.") 49.

As I, Ms. Coyner supervised approximately 20 to 30 employees, consisting of nursing staff as well as administrative staff. Pl. Dep. 16. Her responsibilities encompassed Human Resources duties (such as payroll and employee evaluations), staff and provider education, vendor recovery, and attendance at various meetings, including meetings with patients who had complaints not resolved by patient advocates. *Id.* at 22-24. Ms. Coyner herself reported to a first line supervisor: Ms. Lori Lohar at first, then Mr. James Schulz, and finally, Ms. Molly Bruner.[2] These supervisors reported to Mr. Michael Kilmer, the Director of the Healthcare System, who was thus a second line supervisor for Ms. Coyner. Def. App. 138.

While under Ms. Lohar's supervision, Ms. Coyner and Ms. Lohar signed a document called "Business Process Rules for Gliding Flexitour Schedule with Credit Hours." Def. App. 1. The document set forth the rules and expectations of the Gliding Flexitour schedule, which allowed an employee to "vary arrival and departure times each day" and accrue "credit hours." *Id.* The document defined "credit hours" in turn as "hours an employee elects to work, with supervisory approval, beyond the employee's

---

[1] Plaintiff also submitted an affidavit in response to defendant's motion for summary judgment, which defendant challenged as a "sham affidavit." Def. Reply 4. We, however, find it unnecessary to rely on the challenged affidavit here. We cite throughout this opinion the deposition of Ms. Coyner as included in Exhibit B of plaintiff's response.

[2] Ms. Bruner was Ms. Coyner's supervisor for most of the relevant time period.

basic work requirement under a flexible work schedule." *Id*. Credit hours could be used on the "subsequent day, week, or pay period, with supervisorial approval," so that the employee could be "absent from an equal number of hours of the employee's basic work with no loss of basic pay." *Id*. An employee, however, could not "carry over more than 24 credit hours into the next pay period," nor get "paid basic pay or overtime pay for credit hours accumulated." *Id*.

After signing the document on July 18, 2018, Ms. Coyner started to earn credit hours commencing with the pay period beginning on August 5, 2018. *Id.* at 20. Ms. Coyner also signed an identical document called "Business Process Rules for Gliding Flexitour Schedule with Credit Hours" once Ms. Bruner became Ms. Coyner's supervisor in October 2018. *Id.* at 2. Although Ms. Coyner alleges that she "requested to be taken off the [Gliding Flexitour] schedule multiple times," Pl. Dep. 42, it is nonetheless undisputed that she continuously earned and used credit hours from August 5, 2018, to August 3, 2019, when she left her position as I at Grand Junction. *See* Def. App. 17-45.

Ms. Coyner's basic work requirement consisted of tours of duty that began at 7:00 am and ended at 3:30 pm from Monday to Friday. *See id.* at 17-45. Ms. Coyner thus earned credit hours when she worked before or after those hours on weekdays, or when she worked on weekends. *See id*. According to official timesheets maintained by the VA, Ms. Coyner earned a total of 359.45 credit hours over twenty-six biweekly pay periods and used 303.1 of those credit hours.[3] *See id*. The timesheets also indicate that the distribution of these hours varied significantly, with no two pay periods

---

[3] These numbers were calculated by adding up the "Credit Hours Earned" and "Credit Hours Taken" as recorded in the official timesheets, which are included in the Appendix to defendant's motion. *See* Def. App. 17-45.

reporting the same numbers of credit hours earned and taken.[4] *See id*. At no point do the timesheets indicate that Ms. Coyner earned "overtime."[5] *See id*.

Per the Gliding Flexitour arrangement, Ms. Coyner needed supervisory approval to either earn or use credit hours. It was, however, only a general permission to earn credit hours that Ms. Coyner had to seek up front: Ms. Bruner approved the actual credit hours earned after Ms. Coyner submitted an Excel spreadsheet logging the hours worked and the tasks completed. Suppl. App. To Def. Reply ("Def. SApp.") 31. The official timesheets thus reflected the information that Ms. Coyner provided in the spreadsheet, and Ms. Coyner does not contest their accuracy except that she "worked more hours than what is listed."[6] Pl. Dep. 97. Without offering an exact figure, Ms. Coyner alleges that "there were times when [she] would report [her hours] verbally or with a phone call instead of putting it in a tracking sheet." *Id*. at 99. Ms. Coyner also wrote in an email to Ms. Bruner on February 11, 2019, that she had been "putting in 70 to 80 hours" per week in her job. Def. SApp. 15.

Regarding the hours she worked in addition to her tour of duty (that is, hours in excess of forty hours per week or eight hours per day), Ms. Coyner alleges that she had "no choice when things were delegated to [her], whether it was from the director's office or Ms. Bruner or the ELT chain that work needed to be done." Pl. Dep. 51. As examples of such assignments, she alleges that there were times when a supervisor asked her to meet with a veteran outside of her tour of duty,[7] or to attend a town hall or a veteran

---

[4] Even though the Gliding Flexitour agreement did not allow Ms. Coyner to accumulate more than twenty-four credit hours in a single pay period, the timesheets indicates that she earned more than the maximum in four pay periods. Def. App. 34, 35, 41, 42. She did, however, earn fewer than ten credit hours in six out of twenty-six pay periods and none at all in two periods. Def. App. 22, 25, 27, 30, 31, 37, 38, 45.

[5] The timesheets indicate, however, that Ms. Coyner earned "compensatory time" in several pay periods.

[6] Ms. Coyner wrote in an email to the timekeeper on May 24, 2019, "[P]reviously, I was not accurately [r]epresenting all the hours I was working." Def. SApp. 7.

[7] Ms. Coyner testified during her deposition that she felt she had "no choice"

outreach when she was already at her maximum of twenty-four credit hours.[8] *Id*. at 53, 101-02. She believed that if she did not work the excess hours, "there was a potential for veteran care issues, veteran harm, the veterans not getting the service that they needed." *Id*. at 102-03. What she does *not* allege, however, is that a supervisor explicitly instructed her to "keep working" despite reaching twenty-four credit hours. *See id*. at 101. Instead, she alleges that her supervisors would assign certain tasks, and when she informed them of the status of her hours, "the response would be, well, there's nothing I can do. . . . [T]o the best of what I can recall, it was expressed [the assignment] needed to be done." *Id*. at 102.

When Ms. Coyner communicated her concerns about her excess hours to Ms. Bruner and Mr. Kilmer, they told her to reduce the workload by delegating. *See* App. 71, 139. Whether delegation was possible, however, is disputed: Ms. Coyner, on the one hand, alleges that delegation was not possible because she had "nobody assigned to assist me in supervisory things." Pl. Dep. 51. Ms. Bruner, on the other hand, testified during her deposition that she offered to take over some of Ms. Coyner's duties, only that Ms. Coyner never set up a meeting to discuss how that would be done. Def. App. 69-70, 73-74. Mr. Kilmer also testified during his deposition that he believed that Ms. Coyner could do a better job delegating. *Id*. at 143.

In addition to offering delegation as a solution, however, Ms. Bruner explicitly told Ms. Coyner to stop working once she reached her maximum credit hours. Ms. Coyner testified during her deposition that Ms. Bruner told her "multiple times" to stop working, in emails as well as one-on-one conversations: "Just—you're at your 24 hours. Stop." Pl. Dep. 58. Ms. Coyner alleges, however, that she did not believe it was possible to stop working, because when she was "being directed by [her] leadership to do

---

but to work additional hours when "a veteran shows up at your office or at the director's office and they call me, the director's office calls me and says, you know, veteran so-and-so is up here. Please come up . . . . " Pl. Dep. 53. When viewing the evidence in the light most favorable to the non-movant, a factfinder may reasonably infer that these meetings were unanticipated and that they took place after Ms. Coyner's tour of duty.

[8] Although Ms. Bruner testified during her deposition that Ms. Coyner had a choice not to attend town halls or other public outreach meetings, she did not dispute the fact that Mr. Kilmer sometimes asked Ms. Coyner to go. Def. SApp. 26.

something and that's gonna take [her] over [her] hours . . . [she] need[ed] to do what [she was] being told to do." *Id.* at 59.

## II.   Procedural Background

Plaintiff filed her complaint in this court on June 12, 2020, originally containing four counts. The government filed a motion to dismiss counts III and IV, which alleged that the VA committed a prohibited personnel practice under the Back Pay Act, 5 U.S.C. § 5596 (2018), by requiring Ms. Coyner to pay back a portion of her relocation bonus. Count III alleged that this prohibited practice resulted in a loss of statutorily mandated pay. Count IV alleged a breach of contract. We dismissed count IV for lack of jurisdiction, but we granted leave for plaintiff to amend her complaint as to count III.

Plaintiff subsequently filed an amended complaint on February 19, 2021, leaving the court with two claims at summary judgment.[9] Count I alleges that the VA violated 38 U.S.C. § 7453(e) by willfully failing to pay overtime for all hours plaintiff worked "in excess of fifteen (15) minutes duration in a calendar day, and in excess of forty (40) hours in an administrative workweek, in excess of eight (8) consecutive hours in a workday, or in excess of their daily requirement." Am. Compl. ¶¶ 41-42. Count II alleges that this failure also violated VA policies that were implemented pursuant to 38 U.S.C. § 7421. In addition to attorney's fees and costs of this action, plaintiff seeks backpay and interest for all unpaid overtime hours. Defendant thereafter filed the pending motion for summary judgment on both counts of the complaint.

## DISCUSSION

The court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   RCFC 56(a). Material facts are those "facts that might affect the outcome of the suit under the governing law."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Even if the facts in dispute are material, the dispute must be genuine, meaning "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." *Id.* at 248. In reviewing the evidence at summary judgment, "[t]he evidence of

---

[9] Although initially included in the amended complaint, plaintiff voluntarily withdrew and dismissed the claim seeking return of the relocation bonus she was required to repay (count III).   (ECF No. 17).

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

We find that there is a genuine dispute of material facts in this case and that defendant is not entitled to judgment as a matter of law. A reasonable factfinder could find that the VA induced Ms. Coyner to work overtime for some of the hours she worked in excess of forty hours in a workweek or eight hours in a workday.

## I.   Overtime Compensation for Title 38 Nurses Participating in Flexible Schedule Programs

Because plaintiff was a Title 38 nurse participating in a flexible schedule authorized by 5 U.S.C. § 6122, two different statutory provisions apply to this case.[10]  Under the Federal Employees Flexible and Compressed Work Schedules Act ("WSA"), an agency may establish flexible schedule programs that allow an employee to "elect the time of . . . arrival at and departure from work, solely for such purpose or, if and to the extent permitted, for the purpose of accumulating credit hours to reduce the length of the workweek or another workday." 5 U.S.C. § 6122(a)(2). Credit hours are thus hours "in excess of an employee's basic work requirement, and which the employee elects to work so as to vary the length of a workweek or a workday." *Id*. at 6121(4). A full-time employee working under a flexible schedule may earn up to twenty-four credit hours in a biweekly pay period to apply as "credit" toward the basic work requirement of the next pay period. *Id*. at 6126(a); *see Abbey v. United States*, 124 Fed. Cl. 397, 407 (2015)

---

[10]  At the relevant period, the VA Handbook stated the following policy for permanent full-time nurses: "Overtime is payable for service performed in excess of 40 hours in an administrative workweek, or in excess of 8 hours in a day, whichever is greater, at a rate of one and one-half times the employee's basic hourly pay." Am. Compl. ¶ 55. The Handbook also required supervisory personnel to obtain "proper authorization for overtime before permitting or requiring the performance of overtime work by an employee." *Id*. at ¶ 53. VA policy was thus no different from 38 U.S.C. § 7453(e) in that it entitled a nurse to overtime pay for hours in excess of 40 hours in a workweek or 8 hours in a workday so long as the employee's overtime was permitted or required by supervisory personnel. As such, we will not analyze separately whether the VA's failure to pay overtime violated its policies as well.

(holding that credit hours accumulated beyond the twenty-four hours limitation should be treated as overtime under the FLSA).

Although credit hours are hours of work beyond an employee's basic work requirement, they are separate and distinct from "overtime hours." 5 U.S.C. § 6121(4), (6) (defining "credit hours" and "overtime hours" separately); *Doe v. United States*, 513 F.3d 1348, 1358 (Fed. Cir. 2008) ("[C]redit hours, by statutory definition, are not overtime hours."). Not only do they have different definitions, but the statute also provides unambiguously that credit hours are not compensated with overtime pay. 5 U.S.C. § 6123(b) ("[A]n employee shall not be entitled to be compensated for credit hours worked except to the extent authorized under section 6126 of this title or to the extent such employee is allowed to have such hours taken into account with respect to the employee's basic work requirement."); *Abbey,* 124 Fed. Cl. at 402 ("[U]nlike overtime immediately payable at a one and one-half times the employee's regular rate, monetary compensation for credit hours is capped at twenty-four hours, is payable at the employee's regular rate of pay—not at time and one half—and is due only if and when an employee ends participation in a flexible work schedule program.").

Nevertheless, an employee who is eligible to earn credit hours is not precluded from working overtime hours. The WSA still makes room for overtime hours, so long as those "hours in excess of 8 hours in a day or 40 hours in a week" are "officially ordered in advance." 5 U.S.C. § 6121(6). Although the requirement for "advance" approval applies specifically to flexible schedule employees, [11] the WSA provides that they "shall be compensated for such overtime hours in accordance with such provisions [as 38 U.S.C. § 7453(e)]." *Id.* at 6123(a)(2). Thus, 38 U.S.C. § 7453(e) applies with equal force to flexible schedule employees as the general basis for

---

[11] The legislative history shows that Congress added the requirement for "advance" approval in 5 U.S.C. § 6121(6) to "eliminate[] the problem which would arise under a flexible schedule if an agency were required to determine, after the fact, whether it is appropriate to approve as 'overtime,' hours in excess of 8 hours per day or 40 hours per week which an employee voluntarily elected to work." *Aletta v. United States*, 70 Fed. Cl. 600, 606 (2006). Although the requirement for "advance" approval forecloses the possibility of ex post approval of overtime hours, plaintiff argues in any case that she was *induced* to work overtime, which necessarily takes place before an employee works overtime.

overtime compensation: "A nurse performing *officially ordered or approved* hours of service in excess of 40 hours in an administrative workweek, or in excess of eight consecutive hours, shall receive overtime pay for each hour of such additional service." *Id.* § 7453(e)(1) (emphasis added); *see also id.* §7453(e)(2) (requiring overtime to be at least 15 minutes in duration in a day to be creditable for overtime pay). The issue, then, is what it means for excess hours to be "officially ordered or approved" under 38 U.S.C. § 7463(e).

The Federal Circuit has held that the meaning of "officially ordered or approved" under 38 U.S.C. § 7453(e)(1) has the same meaning as the same words that appear under the Federal Employee Pay Act ("FEPA"), which has been interpreted by a line of decisions since *Anderson v. United States*, 136 Ct. Cl. 365 (1956). *Mercier v. United States*, 786 F.3d 971, 973 (Fed. Cir. 2015) (clarifying that *Doe v. United States*, 513 F.3d 1348 (Fed. Cir. 2008), did not overrule *Anderson*'s statutory interpretation). Under the *Anderson* standard, overtime hours may be "induced" without *written* orders or approval and still qualify as having been "officially ordered or approved." *Anderson*, 136 Ct. Cl. at 371 (holding that the writing requirement under relevant regulations could not limit the scope of the statutory right to overtime compensation).

To constitute order or approval by inducement, however, an employer must have more than "mere knowledge" that an employee is working overtime hours. *Bilello v. United States*, 174 Ct. Cl. 1253, 1258 (1966). An employer's "tacit expectation" that employees work overtime is similarly insufficient to constitute inducement. *Albright v. United States*, 161 Ct. Cl. 356, 361 (1963) (holding that without any "testimony that [the employer] issued such an oral order nor that they had actual knowledge of the practice," there was no more than a "tacit expectation" to arrive 20 minutes before the shift started). Where courts have found more than a "tacit expectation," employers either expressly communicated their expectation of extended hours, scheduled additional hours of work outside of the regular workweek, or issued rules and regulations that had the "practical effect" of requiring overtime hours. *See Manning v. United States*, 10 Cl. Ct. 651, 654 (1986) (describing the "standby" schedule for hours outside of the regular workweek); *Baylor v. United States*, 198 Ct. Cl. 331, 360 (1972) ("Even though there was no specific requirement that overtime be performed, the practical effect of the guard force regulations achieved the same ends."); *Rapp v. United States*, 167 Ct. Cl. 852, 863 (1964) (describing the schedule for additional duty officer tours); *Byrnes v. United States*, 163 Ct. Cl. 167, 172 (1963) ("They were, by express directive, subject to duty twenty-four

hours a day."). These requirements reflect the fact that FEPA's "ordered or approved" standard provides for narrower coverage than the "suffer or permit" standard of overtime under the FLSA. *Mercier*, 786 F.3d at 981 ("The *Doe* court correctly concluded that FEPA's use of the narrower phrase 'ordered or approved' suggests that its coverage is not so broad as FLSA's.").

Thus, Title 38 nurses working under flexible schedules are entitled to overtime pay for excess hours of work that were "officially ordered in advance," including order by inducement. The question is whether plaintiff has created a factual dispute that she was ordered to work such hours.

## II. Inducement of Overtime for Flexible Schedule Employees

Here, defendant's argument for summary judgment proceeds in two parts, based on whether the excess hours Ms. Coyner allegedly worked were credit hours. For the hours that were earned as credit hours, defendant argues that Ms. Coyner is not entitled to overtime compensation by law. For the hours that were not earned as credit hours—because they went beyond the twenty-four hour credit hour maximum—defendant argues that the undisputed instructions to Ms. Coyner to "stop working" when she reached her credit hour maximum establishes an absence of inducement to work overtime. Although Ms. Coyner alleges that her supervisors still assigned her tasks when she was at her credit hour maximum, defendant contends that repeated instructions to delegate and to stop working operated in the background to preclude any inducement to work overtime.

Plaintiff objects to both of these grounds. First, plaintiff argues that the credit hours that she earned were "marked improperly"—that is, the VA should not have classified them as credit hours because she did not "elect" to work those hours within the meaning of 5 U.S.C. § 6121(4) and they were therefore involuntary. Pl. Resp. 23. According to plaintiff, excess hours of work that are performed "by request of a superior, or that is required in order to complete assignments, to meet deadlines, for an Agency to meet its metrics, or due to any other necessity other than solely at the election of the employee so as to vary the length of a workweek or a workday" do not meet the legal requirement of credit hours. *Id*. Regarding the hours not recorded as credit hours, plaintiff argues that there is a genuine dispute concerning inducement because she was "both expressly directed to perform extra work beyond her 24 credit hours, and was placed in a position with duties that could not feasibly be completed without working beyond her 24 credit hours." *Id*. at 31.

As a threshold matter, we reject the argument that an employee may not earn credit hours while completing assignments, meeting deadlines, or pursuing employer objectives because such tasks render the work "involuntary." To adopt plaintiff's definition would either allow employees to fill their credit hours with activities unrelated to their employment or make credit hours a theoretical impossibility. Indeed, the statutory language makes clear that what an employee "elects" for purposes of credit hours is not the *task* performed but the "time of . . . arrival at and departure from work." 5 U.S.C. § 6122(a)(2).[12] For credit hours to have meaning as a statutorily authorized category of excess hours, an employee cannot be barred from working on necessary tasks during those hours.

Neither does the Office of Personnel Management (OPM) guidance on credit hours suggest a contrary interpretation. After setting out the general rule that credit hours may not be earned for travel because "travel is always ordered by an agency," the guidance allows for credit hours to be earned under certain circumstances: "For example, while traveling, employees may use a laptop computer to write speeches and draft or edit reports and other correspondence." U.S. Off. Personnel Mgmt., <u>Fact Sheet: Credit Hours Under a Flexible Work Schedule</u>, https://www.opm.gov/policy-data-oversight/pay-leave/work-schedules/fact-sheets/credit-hours-under-a-flexible-work-schedule (last visited Sept. 2, 2022). So long as the employee performs such tasks "voluntarily," credit hours may be earned during travel. *Id*. Plaintiff's argument, however, would allow for credit hours only if no supervisor had assigned the reports or the correspondences were unrelated to the employee's duties—a result that the OPM is unlikely to have intended, especially in light of its characterization of such tasks as "performing productive and essential work." It is more reasonable to read the OPM requirement of "voluntarily" worked credit hours as referring to the choice an employee has over *when* to work on an assignment.[13]

---

[12] "[A]n employee on [a flexible] schedule may elect the time of . . . arrival at and departure from work, solely for such purpose or, if and to the extent permitted, for the purpose of accumulating credit hours to reduce the length of the workweek or another workday." 5 U.S.C. § 6122(a)(2).

[13] The OPM guidance answers the question, "Are Credit Hours Regularly Scheduled?" in the negative and explains that "[c]redit hours are worked voluntarily by employees in excess of their regularly scheduled 80-hour biweekly basic work requirement." This explanation also supports the

Thus, the mere fact that plaintiff was working on tasks assigned by her supervisors cannot transform her credit hours into "improperly marked" credit hours, and therefore overtime hours. Rather, she must establish that the hours she worked in excess of her basic work requirement independently meet the standard for "officially ordered or approved" overtime; that her employers had more than a "tacit expectation" of overtime hours.

Importantly, Ms. Coyner does not allege that the VA induced her overtime by directly scheduling overtime hours. *Cf. Rapp*, 167 Ct. Cl. at 863 (holding that the Civil Defense Administration induced plaintiffs to work overtime by scheduling additional duty officer tours outside of regular work hours); *Manning*, 10 Cl. Ct. 651 at 654 (holding that Special Services Division induced the plaintiff to work overtime by adding a regular "standby" schedule in addition to the forty-hour workweek). Instead, Plaintiff alleges that the VA induced her overtime by assigning her tasks that could not be completed without working overtime hours.

As plaintiff implicitly acknowledges, the mere assignment of a *task* cannot constitute inducement of overtime: there must be an indication that the employer could not have expected the task to be performed without overtime *hours*. *See Byrnes*, 163 Ct. Cl. at 175-76 (finding an inducement to work overtime where "no administrative or procedural devices could have been employed to make it possible for plaintiffs to properly perform their duties without the performance of some [unscheduled, irregular] overtime work"). In making this determination, however, a flexible schedule employee is situated differently from a standard schedule employee—a distinction that was not required in the *Anderson* line of cases because they did not involve flexible schedule programs. The distinction is important, however, because a standard schedule employee has only regular hours or overtime hours in which to work on a task, whereas a flexible schedule employee has an additional, valid option of using credit hours. What counts as more than a "tacit" expectation of overtime therefore necessarily depends on the non-overtime options available to an employee.

Thus, for the assignment of a task to constitute overtime inducement for a *flexible schedule employee*, the employer must have lacked a basis for expecting the employee to earn credit hours, either because the employee had

---

reading that voluntariness concerns scheduling of work, not the nature of the tasks an employee performs.

already reached the maximum number of credit hours or because the task did not allow the employee to elect *when* she worked.

## III. **Genuine Dispute of Inducement**

Having clarified the standard for a flexible schedule employee's inducement to work overtime, we find that there is a genuine dispute of material facts so that summary judgment may not be granted. After viewing the evidence in the light most favorable to plaintiff as the non-movant, a reasonable factfinder could return a verdict for Ms. Coyner by finding an inducement to work overtime.

For instance, Ms. Coyner alleges that she was sometimes asked to attend a town hall or a veteran outreach when she had already reached twenty-four credit hours, and critically, that her supervisors were aware of the fact. Once Ms. Coyner had reached her maximum of credit hours and communicated the fact to her supervisors, express requests to perform non-delegable tasks—as plaintiff alleges—would have amounted to more than a tacit expectation to work overtime. Even if Ms. Bruner told Ms. Coyner on several occasions to "stop working" once she reached twenty-four credit hours, a reasonable factfinder could find that the specific tasks assigned to Ms. Coyner contradicted those instructions and rendered them moot.

Ms. Coyner also alleges that there were times when her supervisor asked her to meet with a veteran outside of her tour of duty. To the extent that Ms. Coyner could not have elected when these meetings occurred and thus could not have used credit hours for those tasks, a reasonable factfinder could find that these instructions also amounted to inducement to work overtime—regardless of whether she had reached her maximum of credit hours at that point. Although the exact number of overtime hours is not yet established, a reasonable factfinder could find that the VA induced Ms. Coyner to work overtime for at least some of the hours she worked in excess of forty hours in a workweek or eight hours in a workday.

<u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for summary judgment is denied. The parties are directed to confer and submit a joint status report on or before September 20, 2022, regarding further proceedings.

<u>s/Eric G. Bruggink</u>
Eric G. Bruggink
Senior Judge